IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Bureau of Consumer Financial Protection, | ) | |
| | ) | Case No. 1:20-cv-06879 |
| *Plaintiff,* | ) | |
| | ) | Judge John J. Tharp |
| v. | ) | |
| | ) | Magistrate M. David Weisman |
| FDATR, Inc., *et al.*, | ) | |
| | ) | |
| *Defendants.* | ) | |

**MEMORANDUM SUPPLEMENTING PLAINTIFF'S TO MOTION TO COMPEL
DEFENDANT DEAN TUCCI'S DEPOSITION AND FOR SANCTIONS**

On June 7, 2022, the Bureau filed a Motion to Compel Defendant Dean Tucci's

Deposition and For Sanctions, which details the Bureau's efforts to take Tucci's deposition,

including noticing two depositions for which Tucci failed to appear.[1] Prior to filing the Motion to

Compel, Bureau counsel conferred with Tucci's counsel who agreed to a June 14, 2022, date for

Tucci's deposition. The parties filed a joint status report on June 9, 2022, confirming the June 14

deposition date.[2] On June 13, 2022, the Court held a status conference during which Tucci's

counsel stated that to the best of his knowledge, his client would be appearing for his deposition

the following day. Tucci, however, did not show. Instead, twenty-five minutes after the

deposition was set to begin, Tucci's counsel informed the Bureau that his client would not be

attending.[3]

---

[1] ECF No. 65 at p. 1 and Decl, of Carmen Christopher, June 7, 2022, at ¶¶ 3-13; *see also*, ECF Nos. 43, 54, 57, 60, and 62.
[2] ECF No. 67.
[3] Decl. of Carmen Christopher, July 1, 2022, at ¶ 3.

The Bureau's evidence against Tucci is overwhelming and the only remaining discovery in this case is Tucci's deposition.[4] During its investigation of FDATR and Tucci, the Bureau obtained documents and information about FDATR and took Tucci's testimony, under oath, through an investigational hearing—a Bureau proceeding compelled by Civil Investigative Demand.[5] Although Tucci appeared thirty minutes late for the investigational hearing then informed Bureau counsel that he could stay for only three hours, the limited testimony he provided establishes his liability. Tucci now refuses to submit to a deposition, which would enable the Bureau to obtain his full testimony.

The Bureau asks the court to enter sanctions against Tucci. Specifically, the Bureau requests that the Court enter judgment against Tucci finding him liable for the illegal acts and practices of FDATR, Inc.—a company that Tucci owned and managed.

## I.   SANCTIONS AGAINST TUCCI ARE WARRANTED

Tucci's history of recalcitrance in this case is long. After the Bureau filed suit on November 20, 2020, Tucci approached the Bureau about resolving the case, but never engaged in meaningful discussions instead stalling the case with claims of health issues and changes in counsel.[6] On July 23, 2021, the parties filed a Joint Proposed Discovery Plan and on July 26, 2021, the Court referred the case to the Magistrate for discovery supervision.[7] Thereafter, Tucci changed counsel again[8] and he has since repeatedly failed to comply with his discovery obligations.

---

[4] On June 22, 2022, Tucci's counsel informed the Bureau that his client could be available for his deposition on a mutually agreeable day after July 5. The Bureau has little confidence that Tucci would appear.
[5] *See* Decl. of Carmen Christopher, July 1, 2022, at ¶¶ 5, 6.
[6] *See* ECF Nos. 1, 19, 21, 23.
[7] ECF Nos. 29, 31.
[8] ECF Nos. 33, 35, 41.

In the Joint Proposed Discovery Plan, the parties agreed to produce Rule 26(a)(1) Disclosures on September 16, 2021. The Bureau produced its initial disclosures; Tucci did not. On October 20, 2021, the Court ordered Tucci to serve his initial disclosures by November 3, 2021, and both parties to issue written discovery by November 12, 2021.[9] Tucci did neither. On December 16, 2021, Tucci's counsel requested an extension of the deadlines: (1) for his initial disclosures to December 21, 2021; (2) to respond to the Bureau's discovery to December 27, 2021; and (3) to serve written discovery on the Bureau to January 4, 2022.[10] The Bureau did not object and the Court granted Tucci's requested extensions on December 21, 2022.[11]

Tucci produced neither his initial disclosures nor the requested discovery and on February 4, 2022, the Bureau filed a Motion to Compel Initial Disclosures and Discovery from Defendant Dean Tucci.[12] On February 10, 2022, the Court ordered Tucci to produce his initial disclosures and respond to outstanding discovery by February 11, 2022.[13] In its Order, the Court warned Tucci that "his continued failure to cooperate in the discovery process and comply with court orders can result in severe sanctions against him, including this Court recommending to the district court that a judgment be entered against him."[14] The Court stated that it "believes that the defendant personally is failing to cooperate in the discovery process. This will not be tolerated by the Court."[15] The Court further stated that its Order:

> serves as notice to defendant Tucci that he is obligated to
> cooperate in the discovery process and timely respond to discovery
> requests, as well as comply with this Court's orders to respond to
> discovery. Moreover, the Seventh Circuit has instructed that

---

[9] ECF No. 42.
[10] ECF No. 43.
[11] ECF No. 44.
[12] ECF No. 47.
[13] ECF No. 53.
[14] *Id*.
[15] *Id*.

> district courts should (but not must) warn litigants of possible
> sanctions if the party's misconduct continues ….[16]

The Court ordered defense counsel to provide a copy of the entire order to Tucci, "so the Court is assured that Mr. Tucci has been made aware of the possible consequences of his continued misconduct."[17] Tucci's counsel certified on February 16, 2022, that he provided a copy of the Order to his client.[18]

The Bureau first endeavored to schedule Tucci's deposition in December 2021.[19] Following numerous failed attempts to get a date from Tucci, the Bureau noticed his deposition for February 24, 2022. Tucci requested to reschedule the deposition to March 8, 2022, and the Bureau agreed. Tucci, however, failed to appear. On March 14, 2022, the Court extended the fact discovery deadline as to the Bureau, noting that "[b]ased on defendant Tucci's repeated efforts at delaying and obstructing the discovery process (see generally ECF #[53]), the Bureau has effectively been denied the opportunity to engage in meaningful discovery."[20]

After he again failed to provide deposition dates, on March 25, 2022, the Bureau noticed Tucci's deposition for a second time, setting it for April 6, 2022. Again, Tucci did not appear.[21] In its May 9, 2022, minute entry, the Court noted the Bureau's repeated efforts to schedule Tucci's deposition and set a June 7, 2022, deadline for the Bureau to file a motion to compel.[22] The Court stated that "[w]hile the Court appreciates the Bureau's efforts to work with defense counsel for Tucci in conducting a deposition (and appreciates the health challenges that defendant Tucci may be facing), considering the history of this litigation, the Court believes that

---

[16] *Id.*
[17] *Id.*
[18] ECF No. 56.
[19] *See* ECF No. 65.
[20] ECF No. 58.
[21] *See* ECF No. 65.
[22] ECF No. 64.

more than reasonable efforts have been invested in attempting to depose defendant Tucci."[23] The Bureau filed a Motion to Compel on June 7, 2022, asking the Court to compel Tucci's deposition on June 14, 2022—the date the parties agreed upon. For a third time, Tucci failed to appear.[24]

Federal Rule of Civil Procedure 37 specifically states that a court may order sanctions if a party fails, after being served with proper notice, to appear for a deposition, including rendering a default judgment against the disobedient party.[25] When weighing whether to grant default judgment sanctions under Rule 37, courts typically must find that the defaulting party acted with willfulness, bad faith, or fault.[26] In the Seventh Circuit, however, a party's failure to appear for its own deposition is "treated as a more significant violation than other discovery abuses"[27] and accordingly a finding of willfulness is unnecessary.[28] Even so, Tucci's repeated failures to appear for his deposition is evidence of willful conduct and part of his pattern of refusing to engage in the discovery process.

The Seventh Circuit encourages district courts to warn defendants before granting default judgment against them under Rule 37.[29] Such a warning may come from the opposing party as well as the court.[30] Here, Tucci was amply warned. Tucci was on notice from both the Court and the Bureau of the consequences that his contemptuous conduct could bring to bear, including the

---

[23] ECF No. 64.
[24] Christopher Decl., July 1, 2022, at ¶ 3.
[25] Fed. R. Civ. P. 37(b)(2)(A), 37(d)(1)(A), (d)(3).
[26] *See Brown v. Columbia Sussex Corp.*, 664 F.3d 182 (7th Cir. 2011); *Collins v. Illinois*, 554 F.3d 693, 696 (7th Cir. 2009); *Berry v. Steak 'n Shake Inc.,* No. 1:20-cv-02932-JMS-MPB, 2022 WL 2237127 *4 (S.D.Ind. 2022).
[27] *Alston v. Deutsch Borse, AG*, 80 Fed.Appx. 517, 519 (7th Cir. 2003). *See also Skaggs v. Belcher*, No. 20-2092, 2022 WL 886076 (C.D.Ill. 2022).
[28] *Berry v. Steak 'n Shake*, 2022 WL 2237127 *4 (citing *Halas v. Consumer Servs., Inc*., 16 F.3d 161, 165 n. 6 (7th Cir. 1994)); *see also Alston v. Deutsch Borse*, 80 Fed.Appx. at 519.
[29] *See Brown v. Columbia Sussex*, 664 F.3d at 192.
[30] *Id.*

entry of default judgment against him. Yet, despite the Court's February 10, 2022, Order,[31] warning Tucci that he could face sanctions, including a judgment against him, for failing to engage in the discovery process, he thrice failed to appear for his deposition. Tucci refused to submit to a deposition even after the Bureau filed its June 7, 2022, Motion to Compel against him, specifically requesting sanctions should he fail to attend his deposition on June 14, 2022.

District courts are not "obligated to tolerate unnecessary and prolonged delay, nor is the Court 'required to employ graduated sanctions.'"[32] In determining what sanction is appropriate, a court should look at the conduct of the party facing sanctions rather than the opposing party's need for the discovery it seeks.[33] In a case like this one, where a party misses court-ordered discovery deadlines, fails to respond to discovery, and refuses to submit to a deposition, even after being warned by the Court multiple times that he could be sanctioned for such behavior, a default judgment is justified.[34]

Given Tucci's failure to cooperate in discovery and refusal to attend his deposition, the Bureau asks that default judgment be entered against him. Under Rule 37(d)(3), the Bureau also asks that the Court order Tucci or his counsel to pay the reasonable expenses incurred by the Bureau each time Tucci failed to appear for his deposition, notably court reporter and videographer fees.[35] On March 8, 2022, the Bureau paid $1,115.50 for a court reporter and videographer.[36] On April 6, 2022, the Bureau paid $1,094.98 for a court reporter and

---

[31] ECF No. 53.

[32] *Berry v. Steak 'n Shake,* 2022 WL 2237127 *4 (quoting *Alston v. Deutsch Borse,* 80 Fed.Appx. at 520).

[33] *Burress v. Mr. G&G Trucking, LLC*, No. 19-cv-791-jdp, 2020 WL 4381947 *2 (W.D.Wis. 2020) (citing *Golant v. Levy (In re Golant),* 239 F.3d 931, 937-38 (7th Cir. 2001)).

[34] *See Mojapelo v. Nat'l R.R. Passenger Corp*., 748 Fed. Appx. 68, 69-71 (7th Cir. 2019); *Lindsey v. St. Paul Fire and Home*, 202 Fed. Appx. at 138-140; *Abiola v. Abubakar*, Case No. 02-cv-6093, 2007 WL 898197, *1-8 (N.D.Ill. 2007)(ordering defendant to appear for a deposition and stating that if he did not, sanctions will be entered).

[35] Fed. R. Civ. P. 37(d)(3).

[36] Ex. 11.

videographer.[37] And on June 14, 2022, the Bureau paid $944.98 for a court reporter and videographer.[38]  In total the Bureau incurred costs of $3,155.46.

## II.  FDATR VIOLATED THE LAW AND TUCCI IS LIABLE FOR THOSE VIOLATIONS

Formed by Tucci in 2014, FDATR marketed and sold debt-relief and credit-repair services nationwide by promising to reduce or eliminate consumers' student-loan payments and improve consumers' credit scores. The results FDATR promised rarely, if ever, materialized. Its false promises did, however, convince thousands of consumers to pay the company $499-600 dollars each, sometimes more, which FDATR pocketed long before the law allowed it to legally request or receive consumers' money. Though the State of Illinois sued FDATR in 2017 to halt these practices, [39] the company continued to operate and collect unlawful fees until at least April 2019. The Bureau filed suit against FDATR and Tucci in 2020 alleging violations of the Telemarketing Sales Rule (TSR) and the Consumer Financial Protection Act (CFPA).[40]  On February 1, 2022, the Bureau filed for Default Judgment against FDATR, Inc., which the court entered on February 7, 2022.[41]

To complete discovery in this case, the Bureau has endeavored for more than six months to take Tucci's deposition to no avail. Even without Tucci's deposition testimony, however, the Bureau's evidence shows that (1) FDATR violated the TSR and the CFPA and (2) Tucci is liable for the illegal acts of FDATR.

---

[37] *Id.*
[38] *Id.*
[39] Ex. 1 (Illinois Attorney General's Complaint in *Illinois v. FDATR, Inc.*, No. 2017CH13732 (Circuit Court of Cook County, Oct. 13, 2017)); Ex. 2 (Affidavit of Service in *Illinois v. FDATR*, Inc., *et al.*).
[40] ECF No. 1 (Complaint).
[41] ECF Nos. 45, 49, 50.

### a. FDATR's Business Practices

FDATR solicited consumers nationwide, promising to reduce or eliminate consumers' student-loan debts and improve consumers' credit scores.[42] FDATR attracted customers through radio and television commercials that directed consumers to call a toll-free number.[43] FDATR also advertised its services through its website, fedslrelief.com, and through Facebook ads that linked to the website.[44] On both the website and in Facebook advertisements, FDATR claimed that its services would: [45]

| | |
|---|---|
| Reduce or Eliminate Your Payments | Stop Wage Garnishment |
| Lift IRS Tax Liens | Improve Credit Scores |

On its website, FDATR additionally claimed that it would: [46]

| | |
|---|---|
| Cut Loan Payments in HALF | Restore Financial Aid Eligibility |
| Remove I9 Rating[47] | Restore your ability to get your Diplomas & Transcripts |

FDATR's advertisements instructed consumers to call a toll-free number, which connected them to FDATR's telemarketing call center.[48] FDATR's telemarketing-sales agents told consumers that the company had helped thousands of customers resolve their student-loan-payment problems.[49] FDATR's agents told consumers that its services would result in lower student-loan payments or in consumers' student loans being forgiven.[50] As to those student

---

[42] Ex. 6 (Transcript of Nov. 14, 2019, Investigational Hearing of Dean Tucci (Tucci IH Transcript) 57:11-19); Ex. 7 (Website Pages); Ex. 8 (Facebook Excerpts).

[43] Ex. 6 (Tucci IH Transcript 57:11-19).

[44] Ex. 7 (Website Pages); Ex. 8 (Facebook Excerpts).

[45] Decl. of Theresa Ridder, February 1, 2022, at ¶¶ 7-9, 12; Christopher Decl., July 1, 2022, at ¶ 7; Ex. 7 at 4, 7-8 (Website Pages); Ex. 8 at 2-10 (Facebook Excerpts – text of advertisements).

[46] Ex. 7 at 4, 7-8 (Website Pages); Ex. 6 (Tucci IH Transcript 57:11-19).

[47] I9 is a negative status code used on credit reports to designate a loan as non-collectable.

[48] Ex. 6 (Tucci IH Transcript 57:11-59:3); Ex. 9 at 15 (Radio Script).

[49] Ex. 9 pp. 4, 11-12 (Telemarketing Sales Script).

[50] Ex. 9 at 9-10, 16 (Telemarketing Sales Script); Ridder Decl. at ¶ 11.

8

loans, agents assured consumers they would be debt-free, owing $0 in payments.[51] If consumers faced wage garnishment due to a student-loan debt, FDATR promised to resolve the wage garnishment.[52]

For consumers that enrolled in services, FDATR's telemarketing-sales agents caused electronic documents, including a contract, a power of attorney form, and an invoice, to be sent to the enrolling consumer through FDATR's customer management platform.[53] Before sending the documents to prospective customers, FDATR charged the customer a dollar amount of typically $1 or $99, purportedly to ensure that it had a valid payment method on file.[54] For its services, FDATR typically charged customers a minimum of $499 as a one-time payment within two to three weeks of enrollment or $600 paid in installments over a three-to-six-month period, with customers typically making the first payment within days or weeks of enrollment.[55]

FDATR, however, did not deliver on its promises. The services that FDATR typically provided to customers consisted of, at most, completing and filing loan-consolidation paperwork with the Department of Education, and it typically took three to six months to do so.[56] But loan consolidation alone does not achieve the results that FDATR promised to consumers—it does not necessarily result in lower loan payments, does not eliminate payments, and can result in higher payments.[57] FDATR had no basis to assert that its services would result in lower monthly payments, cut student-loan payments in half, or eliminate consumers' monthly student-loan

---

[51] Ex. 6 (Tucci IH Transcript 80:14-18); Ex. 9 at 9, 16 (Telemarketing Sales Script).
[52] Ex. 6 (Tucci IH Transcript 80:11-18).
[53] Ex. 6 (Tucci IH Transcript 62:1-63:77).
[54] Ex. 6 (Tucci IH Transcript 73:20-76:4); Ex. 9 at 7, 9, 13 (Telemarketing Sales Script).
[55] Ex. 6 (Tucci IH Transcript 71:17-72:21, 73:20-76:4); Ex. 9 at 8-9 (Telemarketing Sales Script).
[56] Ex. 6 (Tucci IH Transcript 72:1-17; 93:18-94:16; 96:3-14).
[57] *See* Ex. 6 (Tucci IH Transcript 82:18-83:7).

payments entirely.[58] FDATR did not track whether its services achieved these promised results and customers complained that it did not.[59]

FDATR also had no basis to assert that its services would result in improved credit scores or the removal of negative credit status codes or ratings from credit reports.[60] In fact, FDATR did no work to improve customers' credit scores or to remove negative credit status codes or ratings from customers' credit reports.[61] And FDATR did not track whether its services achieved these promised results—FDATR did not check its customer's credit scores before or after the company purportedly performed it's promised services and it had no way of knowing how, or to what extent, even a successful loan consolidation would impact a consumer's credit score.[62]

FDATR enrolled more than 6,000 customers who collectively paid it more than $2 million.[63] FDATR spent at least three to six months to "get a file completed" and it always requested and received payment from customers at or near the time of enrollment – before it achieved any results – in an amount unrelated to the debt at issue.[64]

### b. Tucci owned and controlled FDATR

Tucci's investigational hearing testimony and documents related to FDATR show that Tucci owned, managed, and controlled all aspects of FDATR, including its management, finances, marketing, and sales practices. In addition, deposition testimony of Tucci's executive assistant, Desiree Keller, who worked for Tucci from 2010 until 2017 and served as his

---

[58] *Id*.
[59] *Id*.
[60] *See* Ex. 6 (Tucci IH Transcript 86:11-24).
[61] *Id*.
[62] *Id*.
[63] Ridder Decl. at ¶ 16.
[64] Ex. 6 (Tucci IH Transcript 71:17-72:21, 73:20-75:19, 94:13-16).

executive and personal assistant from 2012 until 2017, shows that Tucci was intimately involved in FDATR's activities.[65]

FDATR was part of a family of companies owned by Tucci.[66] Tucci formed FDATR in 2014 as a successor to Teldebt Solutions Inc., a company that he formed in 2011.[67] FDATR operated under a variety of names, including Federal Student Loan Relief and Federal Tax Relief.[68] FDATR solicited consumers through telemarketing and its consumer leads were obtained from Direct Marketing Power and its successor National Media Calls—both owned by Tucci and in the business of placing radio advertisements to generate telemarketing leads for debt-relief companies.[69] In 2016, Tucci created another company, DMP Holdings, into which he transferred ownership of FDATR.[70] In 2017, Tucci transferred ownership of FDATR to former Defendant Kenneth Wayne Halverson for $0, to protect the company's assets from a creditor.[71] Tucci continued to actively manage the company as a "consultant" until 2019.[72] Records show that the company continued to take money from consumers until at least April 2019.[73] The State of Illinois involuntarily dissolved FDATR in 2020.[74]

---

[65] Ex. 10 (March 1, 2022, Deposition of Desiree Keller, 9:1-29:10).
[66] Ex. 3 at 2, 12-16 (*Urban One, Inc., v. Dean Tucci*, No. 1:17-cv-07892, ECF No. 76, 2018 WL 47148471 (Mem. Op. and Order, Prelim. Inj. (N.D. Ill., Sept. 30, 2018)); Ex. 4 at 2-4 (*Urban One, Inc., v. Dean Tucci*, No. 1:17-cv-07892, ECF No. 124, 2020 WL 1548959 (Order Granting Summary Judgment to Urban One (N.D. Ill., April 1, 2020)).
[67] Ex. 5 at 1-2 (Illinois Secretary of State Documents) and Christopher Decl., July 1, 2022, at ¶ 4; Ex. 6 (Tucci IH Transcript 12:7-13:19).
[68] Ex. 5 at 3-4 (Illinois Secretary of State Documents).
[69] Ex. 6 (Tucci IH Transcript 22:1-23:6, 34:24-35:1, 57:11-19); Ex. 3 at 2, 12-16 (*Urban One v. Tucci* (Prelim. Inj.)).
[70] Ex. 6 (Tucci IH Transcript 33:24-34:10); Ex. 3 at 2, 12-16 (*Urban One v. Tucci* (Prelim. Inj.)).
[71] Ex. 6 (Tucci IH Transcript 42:10-24, 43:18-23, 99:6-100:17).
[72] Ex. 6 (Tucci IH Transcript 42:25-43:23, 99:6-100:17).
[73] Rider Decl. at ¶ 14.
[74] Ex. 5 at 19 (Illinois Secretary of State Documents).

In addition to being an owner and officer of FDATR, Tucci was responsible for FDATR's business practices.[75] Tucci designed FDATR's marketing method of soliciting consumers through radio advertisements that enticed consumers to call FDATR's toll-free number.[76] Tucci drafted the company's advertisements and telemarketing sales scripts.[77] He hired employees for FDATR, including the company's telemarketing sales agents and managers.[78] He drafted training materials and trained FDATR's telemarketing sales agents, including by conducting mock sales calls.[79] He was also responsible for the content of the company's website.[80]

Tucci's office was next door to FDATR's telemarketing operations and he regularly spent time on the sales floor.[81] Tucci actively monitored FDATR's telemarketers through cameras he installed at FDATR with video feeds that he could view both at his office desk and on his cell phone.[82] FDATR had a VoIP (Voice over Internet Protocol) phone system that allowed Tucci to listen to phone calls and, in fact, he did listen to FDATR sales calls.[83] Tucci was blind cc'd on every FDATR manager email account and reviewed the emails.[84] Tucci monitored FDATR's chargebacks—a complaint a consumer makes with a bank to contest credit card charges—via a website link, discussed those chargebacks with FDATR's managers, and disputed the chargebacks in an effort to keep customer's payments.[85]

---

[75] *See* Ex. 10 (Keller Dep. 48:8-13).
[76] Ex. 6 (Tucci IH Transcript 57:11-59:6; 59:25-61:20;).
[77] Ex. 6 (Tucci IH Transcript 51:5-53:8); Ex. 10 (Keller Dep. 39:8-41:7).
[78] Ex. 10 (Keller Dep. 42:21-44:10).
[79] Ex. 6 (Tucci IH Transcript 55:25-56:14); Ex. 10 (Keller Dep. 39:8-40:11).
[80] Ex. 10 (Keller Dep. 45:1-46:3).
[81] Ex. 6 (Tucci IH Transcript 38:8-15); Ex. 10 (Keller Dep. 37:15-38:11).
[82] Ex. 10 (Keller Dep. 26:2-27:19; 32:22-23; 34:4-7).
[83] Ex. 10 (Keller Dep. 35:19-36:12).
[84] Ex. 10 (Keller Dep. 25:9-26:1; 27:20-29:10; 34:8-22).
[85] Ex. 10 (Keller Dep. 23:3-25:4).

Tucci also controlled FDATR's bank accounts and was the only signatory on those accounts.[86] Tucci regularly moved money between bank accounts held by FDATR and his other companies.[87] And, he used those accounts as his piggy bank, depending on which accounts had the most funds available.[88] Tucci routinely used company funds for his personal expenses.[89] Tucci used FDATR's bank accounts to pay his personal rent, his car payments, and support payments to his ex-wife.[90] He used company funds to pay for his gym membership and numerous household expenses, including home landscaping, electricity, cable and Internet, and mosquito abatement.[91] He also used company funds to pay rent and tuition for his children and to pay for cosmetic surgery for his girlfriend.[92] Tucci's access to and unabated use of company funds illustrates the level of control he exercised over FDATR.

### c. FDATR violated the TSR and CFPA

FDATR violated the Telemarketing Sales Rule by collecting fees from consumers before it was legally allowed to do so. FDATR also violated the TSR and the CFPA by engaging in deception.

#### i. FDATR collected advance fees for debt-relief and credit-repair services in violation of the TSR (Counts I and II).

The TSR applies to "telemarketing," defined to mean "a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call."[93]

---

[86] Ex. 10 (Keller Dep. 61:25-62:3).
[87] Ex. 10 (Keller Dep. 59:5-61:20).
[88] Ex. 10 (Keller Dep. 48:14-57:25).
[89] Ex. 10 (Keller Dep. 51:25-52:3; 53:22-54:16).
[90] Ex. 10 (Keller Dep. 49:9-19).
[91] Ex. 10 (Keller Dep. 52:4-22).
[92] Ex. 10 (Keller Dep. 53:7-18, 56:2-20).
[93] 16 C.F.R. § 310.2(gg).

FDATR is subject to the TSR as (1) a "telemarketer," because it initiated and received telephone calls from customers in connection with telemarketing, and (2) a "seller," because it provided or offered to provide services to its customers in exchange for consideration in connection with a telemarketing transaction.[94] The TSR prohibits telemarketers from requesting or receiving advance fees for both debt-relief and credit-repair services.[95]

FDATR provided a "debt relief service" as defined by the TSR because it offered to renegotiate, settle, or alter the terms of payment or other terms of debt between consumers and their unsecured creditors or debt collectors—FDATR offered to eliminate consumers' debts and eliminate or reduce consumers' loan payments.[96] Under the TSR, a debt-relief-service provider cannot request or receive payment of its fees unless (1) it has renegotiated, settled, reduced, or altered the terms of at least one debt under a bona fide agreement or plan with the creditor or debt collector; (2) the customer has made at least one payment under that agreement or plan; and (3) the fee is proportional to or a percentage of the amount saved.[97]

FDATR also promised to improve consumers' creditworthiness. With respect to credit-repair services, a telemarketer cannot request or receive payment of its fees for services purporting to remove derogatory information from or improve a person's credit history, credit record, or credit rating until (1) the promised timeframe for providing the services has expired and (2) the seller has provided a consumer credit report demonstrating that the promised results have been achieved, and the report is issued more than six months after the results were achieved.[98]

---

[94] 16 C.F.R. § 310.2(dd), (ff); Ex. 6 (Tucci IH Transcript 57:11-59:3).
[95] 16 C.F.R. § 310.4(a)(5)(i) (prohibiting advance fees for debt-relief services); 16 C.F.R. § 310.4(a)(2) (prohibiting advance fees for credit-repair services).
[96] 16 C.F.R. § 310.2(o).
[97] 16 C.F.R. § 310.4(a)(5)(i).
[98] 16 C.F.R. § 310.4(a)(2).

FDATR collected fees before achieving the prerequisite results required by the TSR. FDATR collected upfront fees of about $499 or $600 from its customers. During the initial telemarketing sales call with consumers, FDATR always collected at least $1, and at times $99, from prospective customers to "start a file," purportedly to ensure that a successful payment method was on file with the company.[99] For consumers that enrolled in FDATR's program, the company typically charged fees of either (1) $499 for a one-time payment made at or near the time of enrollment, or (2) $600 paid in installments over three to six months.[100] With respect to debt relief, FDATR collected these payments (1) before and regardless of whether any results were achieved and (2) in amounts that were standard rather than proportional to the debt eliminated.[101] Tucci testified that "it would typically take three to six months to get a file completed" to submit for loan consolidation,[102] but FDATR collected payments from customers immediately upon their enrollment or within three to six months, and thus, it necessarily collected fees from customers before it could achieve the promised results. With respect to credit repair and FDATR's promise to improve consumers' credit scores and remove negative credit ratings, Tucci admitted that FDATR never performed any such services for its customers.[103] Consequently, FDATR violated the TSR each time it collected a fee.

### ii. FDATR's deceptive advertising violated the TSR and the CFPA (Counts III and V).

FDATR violated both the TSR and the CFPA when it misrepresented that its program would (1) reduce, eliminate, or cut in half consumers' student loan payments; (2) improve

---

[99] Ex. 6 (Tucci IH Transcript 73:20-25, 74:16-75:2).
[100] Ex. 6 (Tucci IH Transcript 71:17-23).
[101] Ex. 6 (Tucci IH Transcript 73:20-75:19 (the fees charged to consumers were standard amounts unrelated to the amount of debt at issue).
[102] Ex. 6 (Tucci IH Transcript 72:1-21).
[103] Ex. 6 (Tucci IH Transcript 86:11-24).

consumers' credit scores; and (3) achieve a litany of additional results for which it failed to provide any related services.

### 1. FDATR's deception violated the TSR.

The TSR prohibits a seller or telemarketer from misrepresenting "any material aspect of the performance, efficacy, nature, or central characteristic of goods or services that are the subject of a sales offer," as well as "any material aspect of any debt relief service."[104] Misrepresentations about material aspects of debt-relief services include: (1) "the percentage of the debt amount that a customer may save by using such service"; (2) "the effect of the service on collection efforts of the customer's creditors or debt collectors"; and (3) "the effect of the service on a customer's creditworthiness."[105] When making representations about a material aspect of its service, a seller or telemarketer must have a reasonable basis to substantiate its claims.[106]

FDATR did not track the effect of its services on its customers' debt or credit scores.[107] Accordingly, it had no reasonable basis to substantiate its claims that it could (1) reduce or eliminate a consumer's student-loan payments or cut those payments in half or (2) improve a consumer's credit score.[108] In fact, Tucci admitted during his testimony that FDATR did not

---

[104] 16 C.F.R. § 310.3(a)(2)(iii), (x).

[105] 16 C.F.R. § 310.3(a)(2)(x).

[106] 75 Fed. Reg. 48,458, 48,500-501 (Aug. 10, 2010) ("The reasonable basis test is an objective standard; an advertiser's good faith belief that its claim is substantiated is insufficient.").

[107] Ex. 6 (Tucci IH Transcript 82:18-83:7, 86:11-21).

[108] *See FTC v. E.M.A. Nationwide, Inc*., No. 1:12-CV-2394, 2013 WL 4545143, at *4 (N.D. Ohio Aug. 27, 2013), aff'd, 767 F.3d 611 (6th Cir. 2014) (defendant violated § 310.3(a)(2)(x) where scripts instructed employees to tell consumers that its program would cut their "debt by 50% OR MORE" and where it told one consumer that it would relieve sixty to sixty-five percent of her debt, took an upfront fee, and provided no assistance); *FTC v. Affiliate Strategies, Inc.*, No. 09-4104-JAR, 2011 WL 4352411, at *6, 9 (D. Kan. Sept. 16, 2011) (no basis to substantiate the claims that consumers were "guaranteed" or likely to receive grant money based on company's "high success rates" when defendants did not track their success rate).

track whether its services resulted in lower payments for its customers.[109] And, he acknowledged that loan consolidation does not necessarily result in lower payments and could leave consumers with higher payments.[110] Tucci admitted that FDATR did not actually provide any services related to consumers' credit scores, removing I9 ratings from consumers' credit reports, or restoring consumers' financial aid eligibility or ability to get diplomas and transcripts—all promises FDATR made in its marketing efforts to attract customers.[111]

## 2. FDATR's deception violated the CFPA.

The CFPA prohibits "any covered person" from engaging in any deceptive act or practice.[112] FDATR is a "covered person" because it engaged in offering or providing consumer-financial products or services, which includes "financial advisory services" that assist consumers with "debt management."[113] Under the CFPA, an act or practice is deceptive if there is a material representation that is likely to mislead consumers acting reasonably under the circumstances.[114] A misrepresentation is considered "likely to mislead consumers" if it is either (a) false or (b) there is no reasonable basis to support it.[115] Representations about the savings customers will experience from a debt-relief service are "highly material claims," as are claims about the impact on creditworthiness and on creditors' abilities to collect debts.[116]

---

[109] Ex. 6 (Tucci IH Transcript 82:18-83:7).

[110] *Id*.

[111] Ex. 6 (Tucci IH Transcript 86:11-87:10).

[112] 12 U.S.C. §§ 5531, 5536(a)(1)(B).

[113] *See* 12 U.S.C. §§ 5481(5), (6), (15)(A)(viii)(II).

[114] *See CFPB v. Gordon*, 819 F.3d 1179, 1193 (9th Cir. 2016); *CFPB v. Hanna & Associates, P.C.*, 114 F. Supp. 3d 1342, 1370 (N.D. Ga. 2015) ("deceptive practice" has the same meaning under the CFPA that it has under the FTC Act).

[115] *See FTC v. Affiliate Strategies, Inc*., 849 F. Supp. 2d 1085, 1106 (D. Kan. 2011) (claims about success rate were misleading because defendants did not track success).

[116] 75 Fed. Reg. 48,499 (because they are "highly material," the TSR prohibits misrepresentations about the amount of debt a consumer might save or the effect of a service on a consumer's creditworthiness or on a collector's efforts).

In both its advertisements and telemarketing-sales pitches, FDATR told consumers that its services would result in lowered or eliminated student-loan payments. FDATR also claimed that its services would result in improved credit scores and that the company could remove the negative status code—I9—used to designate a loan as non-collectable from consumers' credit reports. These representations were false or unsubstantiated. First, Tucci admitted that the company's services did not necessarily result in lower monthly payments and could result in higher payments.[117] FDATR told many consumers that their services would result in loan payments of $0 and that the loans would be forgiven, but rarely, if ever, achieved this result.[118] Second, FDATR's marketing claims that its services would lead to improved credit scores or the removal of a negative credit status code were groundless. Tucci admitted that FDATR did not provide any services related to credit reporting or scores and in no way tracked whether it achieved the promised results.[119] Finally, FDATR claimed that it would restore consumers' financial-aid eligibility and ability to get diplomas and transcripts, but it did nothing to fulfill these promises and failed even to track whether its services achieved these results.[120]

These marketing claims were material because they were the main services that FDATR offered—debt relief and credit repair—and were the outcomes that financially distressed consumers paid FDATR to pursue. FDATR's misrepresentations were likely to, and in fact did, mislead financially distressed consumers into paying substantial amounts of money to FDATR to their detriment.[121] And it was reasonable for consumers to rely on the statements that FDATR made about its own services.

---

[117] Ex. 6 (Tucci IH Transcript 82:18-83:7).
[118] Ridder Decl. at ¶¶ 10-11 (Summary of Consumer Complaints); Ex. 9 at 9, 16 (Telemarketing Sales Script).
[119] Ex. 6 (Tucci IH Transcript 86:11-21).
[120] Ex. 6 (Tucci IH Transcript 86:25-87:10).
[121] Ridder Decl. at ¶¶ 10-11 (Summary of Consumer Complaints).

### iii. FDATR's Violations of the TSR are also violations of the CFPA (Count IV).

Under the CFPA, it is unlawful for any covered person or service provider to commit any act or omission that violates a "Federal consumer financial law."[122] FDATR is a covered person under, and therefore subject to, the CFPA.[123] A violation of the TSR that is committed by a person subject to the CFPA shall be treated as a violation of a rule under § 1031 of the CFPA regarding unfair, deceptive, or abusive acts or practices.[124] Therefore, a violation of the TSR by a covered person is also a violation of the CFPA. Because FDATR is a covered person and committed acts that violated the TSR, those violations also constitute violations of the CFPA.[125]

### d. Tucci is Liable for FDATR's Violations of the TSR and CFPA

Tucci is liable for violations of the TSR as a "seller" because he arranged for FDATR to provide its debt-relief services through telemarketing.[126] Tucci founded, owned, and managed FDATR as previously described. He also developed the company's telemarketing program and drafted the telemarketing sales scripts.[127]

Tucci is also liable under the TSR for providing substantial assistance or support to FDATR because he knew or consciously avoided knowing that it was engaged in acts or practices that violated 16 C.F.R. §§ 310.3(a) or 310.4.[128] The preamble to the TSR gives an example of conduct, when coupled with the requisite knowledge or conscious avoidance, that establishes "substantial assistance," including "providing any script . . . or direct marketing piece used in telemarketing," or "providing an appraisal or valuation of a good or service . . . [that] has

---

[122] 12 U.S.C. § 5536(a)(1)(A).
[123] 12 U.S.C. § 5481(6)(A), (15)(A)(viii).
[124] 12 U.S.C. § 5531, 15 U.S.C. § 6102(c)(2).
[125] 12 U.S.C. § 5536(a)(1)(A).
[126] 16 C.F.R. § 310.2(dd).
[127] Ex. 6 (Tucci IH Transcript 51:5-52:17; 57:11-59:6).
[128] 16 C.F.R. § 310.3(b).

no reasonable basis in fact or cannot be substantiated."[129] Tucci knew that FDATR took fees from consumers before it provided services that met the requirements of the TSR.[130] He was involved in the design of FDATR's program and marketing materials and knew or should have known that the representations being made about the success of the program were false or had no reasonable basis and could not be substantiated.[131] Even as a purported consultant, Tucci violated the TSR by providing substantial assistance to FDATR because he knew or consciously avoided knowing that FDATR's practices violated the TSR—this is particularly true given that the ILAG sued him for the same conduct, yet FDATR continued with the same practices.

Tucci is liable under the CFPA as a "related person" or a "covered person."[132] A person, like Tucci, is a "related person" if he is a "director, officer, or employee charged with managerial responsibility for . . . such covered person" or a "shareholder, consultant, joint venture partner, or other person . . . who materially participates in the conduct of the affairs of such covered person."[133] FDATR is a "covered person" and Tucci is a "related person" because he was an officer of and had managerial responsibility for FDATR—he was the company's decision maker, handled the company's day-to-day operations, and was responsible for FDATR's marketing and sales practices. Tucci remained a "related person" after he transferred ownership of FDATR to Halverson in 2017 because he worked as a consultant for FDATR and materially participated in its conduct and affairs. As a related person, Tucci is also deemed a "covered person" under the

---

[129] 60 Fed. Reg. 43,842, 43,852 (Aug. 23, 1995); *see also FTC v. Affiliate Strategies, Inc.*, No. 09-4104, 2011 WL 4352411, at *11 (D. Kan. Sept. 16, 2011).
[130] Ex. 6 (Tucci IH Transcript 71:17-72:21, 73:20-76:4).
[131] Ex. 6 (Tucci IH Transcript 82:18-83:7, 86:11-21).
[132] 12 U.S.C. § 5481(25)(C)(i) and (ii).
[133] *Id.*

CFPA.[134] And covered persons are liable if they engaged in a deceptive practice, as Tucci did here.

### III. CONCLUSION

Default Judgment should be entered against Tucci as a sanction for his repeated refusal to participate in discovery and submit to a deposition. Because Tucci violated the TSR and CFPA and is liable for FDATR's illegal acts, the Bureau asks that the court enter a default judgment and order against Tucci that is substantially similar to the Default Judgment and Order Against FDATR, Inc., entered by the Court on February 7, 2022.[135]

Dated: July 1, 2022        Respectfully submitted,

/s/ Carmen Christopher
Carmen L. Christopher (CA Bar No. 231508)
Telephone: (202) 754-0329
carmen.christopher@cfpb.gov
Kristina D. Betts (AZ Bar No. 024859)
Telephone: (202) 834-2723
kristina.betts@cfpb.gov
Bureau of Consumer Financial Protection
1700 G Street, NW
Washington DC, 20552

*Attorneys for Plaintiff*
*Bureau of Consumer Financial Protection*

---

[134] 12 U.S.C. § 5481(25)(B).
[135] ECF No. 50.