IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Bureau of Consumer Financial Protection, | ) | Case No. 1:20-cv-06879 |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | Judge John J. Tharp |
| v. | ) | |
| | ) | |
| FDATR, Inc., et al., | ) | |
| | ) | |
| *Defendants*. | ) | |

**DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

*SUMMARY JUDGMENT LEGAL STANDARD*:

Summary judgment is proper where pleadings, discovery, and affidavits show there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The district court should grant summary judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). If the moving party shows that there are no genuine issues of material fact, the burden shifts to the non-moving party to "go beyond the pleadings and by [his] own affidavits or by the 'depositions, answers to interrogatories and admissions on file,' designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986) (quoting Fed. R. Civ. P. 56) A scintilla of evidence, or evidence that is merely colorable or not significantly probative, does not present a genuine issue of material fact. *United Steelworkers of America v.*

*Phelps Dodge*, 865 F.2d 1539, 1542 (9th Cir. 1989). Reasonable doubts as to the existence of a material factual issue is resolved against the moving party and inferences drawn from facts are viewed in the light most favorable to the non-moving party. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630-31 (9th Cir. 1987). A pro se plaintiff is to be held to a less stringent standard than a plaintiff acting with assistance of counsel. *Erickson v. Pardus*, 551 U.S. 89, 95 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

## II. DETERMINING "MATERIAL FACT"

To preclude summary judgment, a fact dispute must be "material." A fact issue is material if it must be decided in-order-to resolve the substantive claim or defense to which the motion is directed. As the Supreme Court explained in *Anderson v. Liberty Lobby*, "Only disputes over facts that might affect the outcome of the suit" preclude summary judgment. The opinion in Anderson further observes that "the materiality determination rests on the substantive law, [and) it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs. When confronted with an asserted factual dispute, therefore, the court must examine the elements of the claims and defenses at issue on the motion to determine whether a resolution of that· dispute could affect the disposition of any of those claims or defenses. Materiality is a question of law. That a jury's verdict on an issue might be influenced by disputed evidence legally relevant only to other issues cannot be considered in deciding materiality. Lawsuits frequently present several issues and, at least potentially, numerous disputes over historical facts and inferences relevant to those issues. But if a suit is

resolvable without the necessity of reaching and deciding some of those issues, then summary judgment may still be appropriate. In *Celotex Corp. v. Catrett*, for example, although there were many issues concerning defendant's liability for death allegedly caused by its product, the threshold issue was whether the decedent had been exposed to that product. If that essential element could not be proved, summary judgment was appropriate regardless of disputes over other issues. Similarly, when the plaintiff in a civil rights action claimed that a police officer had lied to a judge to obtain an arrest warrant, the court's finding that the judge would have issued the warrant regardless of the allegedly false statements rendered im191. 477 U.S. 242, 248 (1986). 192. ld. at 248. It is not sufficient to preclude summary judgment that a jury, on hearing the entire case, might reach a different outcome. See the dissent of Justices Black and Douglas from the 1963 amendment to Rule 56. 31 F.R.D. 617, 618 (1963) material the dispute over whether false statements had been made. Likewise, a dispute over plaintiffs' contention that an aircraft crash was caused by metal fatigue was not material when undisputed evidence established that the crash would have occurred because of natural forces, regardless of the state of the metal, or if the nonmovant's version of the facts, although disputed, could not support a verdict as a matter of law, the dispute is immaterial because the legal sufficiency of the alleged facts can be decided on the assumption that they are true. The determination of materiality, therefore, requires analyzing the logic of the case. Issues must be identified clearly and ordered in relation to each other. By this process, courts can ascertain which issues may be dispositive of the case, rendering other factual disputes immaterial.

## III. PROCEDURAL BACKGROUND

The Plaintiff filed this action on November 20, 2020, alleging that Tucci and FDATR (1) violated the TSR by taking illegal advance fees from consumers and (2) violated both the TSR and the CFPB by engaging in deception. FDATR was served on November 25, 2020, and, after it failed to answer the Bureau's Complaint, the Clerk of Court entered default against it on October 6, 2021.4 Tucci retained new counsel in October 2021.5 During a status hearing on October 20, 2021, the Magistrate Judge asked counsel if he also represented FDATR and whether he would be moving to lift the default against FDATR. Counsel responded that he represents Tucci only, not the company.6 On February 1, 2022, the Bureau sought default judgment under Rule 55(b) against FDATR, which the Court entered on February 7, 2022. Plaintiff then proceeded to file their motion for summary judgment sometime after.

## IV. ARGUMENT

### Jurisdiction and Venue Issues

The court should not have jurisdiction over this action because it's brought under Federal Consumer Financial law. Defendant asserts that the CFPB does not have jurisdiction over FDATR because said company was a doc prep, tax prep and accounting firm. The Consumer Financial laws do not apply to this company, so they in fact they do not have jurisdiction over the business of FDATR.

### TUCCI HAD THE AUTHORITY TO CONTROL FDATR AND WAS ACTIVELY INVOLVED IN ITS BUSINESS ACTIVITIES

Defendant Tucci also reiterates the corporations did business in the aforementioned district, not him as an individual. Defendant Dean Tucci formed FDATR Inc in 2014 under the laws of the state of Illinois and served as its initial director officer and sole shareholder. FDATR was the successor to Tel-Debt Solutions, another company by Tucci that offered student

loan debt relief services and federal tax relief. Tel-Debt Solutions was a separate company that provided pay per call media programs to tax firms. One of those tax firms was community tax. Tel-Debt Solutions was a sales affiliate for community tax. FDATR was not a successor company it was an individual company that was started to handle doc prep for student loans consolidations.

Plaintiff then goes on to assert that FDATR operated in the same office space as Tel-Debt under the same lease signed by Tucci for said company, employed many of the company's former employees, and used the desks, computers, phones, phone system and video surveillance system. Defendant contends that is not accurate, and a clear question of material fact. He states that FDATR was in the same suite but was in a different set of offices. Further FDATR had its own phone system, its own desks, its own computers and was a separate business entity from Tel-Debt Solutions.

Plaintiff's next allegation goes on to state that "FDATR operated under a variety of names, including Federal Student Loan Relief and Federal Tax Relief". Defendant contends that this not accurate, and a clear question of material fact. He states that FDATR had DBA's, that it and it was registered with the state of Illinois, so to say that it operated under a variety of names is completely unfounded. In 2016, Defendant Tucci created another company, DMP Holdings, in which he transferred ownership of FDATR. This is accurate as the company was in a fund raising situation and Defendant's investor group out of New York asked us to put the ownership into a holding company

Plaintiff's motion for summary judgment then goes on to state, "In addition to being an owner and officer of FDATR, Tucci was responsible for handling all FDATR business practices". Defendant asserts that is correct, and that the company operated with a high regard for working on a proper level and consulted with attorneys to make sure that every asset of the business was legal. In fact, it hired one of the top attorneys in the country, Robby Birnbaum, who was the president of the National Student Loan Association and was responsible for the overseeing and approving all of the student loan document prep business that came to FDATR. Mr. Birnbaum's

Declaration in Support of Defendant is being submitted with these pleadings.

The next allegation is that “Tucci hired employees for FDATR, including the company's telemarketing sales agents managers and made firing decisions” Defendant states this is completely inaccurate and states that the company had managers, along with a full-time recruiter and that only in rare circumstances, if there was a problem with an employee, only then would he get involved. He asserts that other than the aforementioned circumstance, he had no say over the hiring and firing of individuals. In support, he reiterates that this information came from a deposition by Desiree Keller who was never employed by FDATR, so he contends this is hearsay.

Plaintiff then goes on to state “In addition to FDATR Tucci owned Direct Media Power, also called DMP, which was in the business of placing radio advertisements to generate telemarketing leads for debt settlement companies including FDATR”. Defendant asserts that is completely inaccurate and that Direct Media Power was a “pay per call media agency” and it had a wide variety of clients, including health insurance, treatment centers, gold companies, mortgage brokers, and tax prep and accounting firms. Tucci sets forth that a very small portion of the business was for student loan consolidation and doc prep companies. Direct Media Power never sold leads. Defendant states that the CFPB doesn’t have a clear understanding of how a media and ad agency actually works and explains that you are selling advertising time, clients are buying that advertising time from DMP.

Direct Media Power handled the first and only aspect of direct marketing which was calls. They never handled anything else for any other client so to make a statement that they were doing leads for debt settlement companies is completely inaccurate. In addition, the debt settlement industry was shut down on October 27, 2010. There were no debt settlement clients so to say that we were working with debt relief companies again is completely inaccurate. Defendant asserts that there is no viable proof as to support this claim by the plaintiff, then this Should be deemed a clear question of material fact.

They then allege that Tucci was responsible for FDATR's marketing method of soliciting

consumers through radio advertisements placed through direct media power and later through national media. Tucci asserts again this is completely inaccurate. The business for FDATR and the student loan doc prep portion of that business was brought on by a company called Student Loan Repairman and that company was owned by Chris Foufas and Danny Dayan. Mr. Dayan was the brother of the owners of Community Tax and they brought on their own business and they were marketing and purchasing pay per call programs through DMP. FDATR was not purchasing any type of pay per call programs from direct media power.

Plaintiff's next allegation is that FDATR also advertised its services through its website fedslrelief.com. Defendant asserts this is not true. He states the company had a website and it did not advertise that website. When you make a statement saying you are advertising a website, that means you are running an ad that has a website in it and they can be a radio commercial and that radio commercial would then say go to this website. The website was created so that after people called in through a toll-free number, if they had questions they could go to the website, but to make a comment that the company advertised its website is completely inaccurate and a question of material fact.

Plaintiff's memorandum then goes on to claim that "… on fedslrelief.com as well as on Facebook advertisements that linked to the website, FDATR claimed that its services would reduce or eliminate your payments and improve credit scores. On its website FDATR additionally claimed that it would cut loan payments in half, remove I9 ratings, restore financial aid eligibility and restore your ability to get diplomas and transcripts. Defendant Tucci has no knowledge of any Facebook page or said advertising. He never authorized anyone from the company to use Facebook. In addition, if in fact those words that Miss Ridder stated in her declaration, we're on the Facebook page, she should also look at the actual Department of Education website which also has the exact same verbiage. FDATR was a doc prep company that worked hand in hand with the Department of Education. Anything that stated on the website was approved by legal counsel and was approved as verbiage by the Department of Education.

Further, it is claimed that "Tucci was responsible for the content of the company's

website and was listed as the registrant of and billing contact for the company's website". Defendant asserts this again is Desiree Keller making things up. He asserts she did not work for the Company, she did not know anything about the company, and she is completely lying to say that Tucci wrote the content of the website. Once again, no evidence of what was claimed was presented by the Plaintiff, making it a question of material fact.

The motion proceeds to say "FDATR's advertisements instructed consumers to call a toll free number that connected prospective customers to FDATR'S telemarketing call center". Defendant states that FDATR did not run any ads, no radio commercials, and no TV commercials. However, there was the federal student loan hotline that was running and that radio commercial supplied phone calls to various student loan consolidation doc prep companies throughout the United States. FDATR and Fed Student Loan Relief was one of those companies but FDATR did not run ads under its own name.

Defendant further states that Tucci drafted the companies advertisements and telemarketing sales scripts. During the bureau's investigational hearing, Tucci stated that he had multiple FDATR scripts in his possession which he then produced to the Bureau through council. Again, the company had *sales scripts* not telemarketing sales scripts. It had customer service questionnaires and when someone would call in when they were in default of their federal student loan, the verbiage in that script came right off the Department of Education website and was also approved by legal counsel prior to any customer service agent speaking to anyone that was in default on their federal student loans. To allege that Tucci drafted the advertisements and telemarketing sales scripts again is a question of material fact.

Plaintiff then sets forth the following: "The telemarketing sales scripts produced by Tucci show that FDATR's sales agents told consumers that the company had helped thousands of customers with services that resulted in lower student loan payments or consumer student loans being forgiven leaving customers debt free and going zero in payments". Defendant asserts this is not accurate, and that is taken out of context. Those are remedies that the Department of Education could produce; however, it only was for public service agents. The CFPB is wrong by saying that that's what was represented to every single client that called in, and Defendant

reiterate that it was only presented to people that were public service agents and again this is directly off what the Department of Education had on their website.

Plaintiff then proceeded to go back to Keller's deposition where it is stated that "Tucci drafted materials and trained FDATR's telemarketing sales agents including conducting mock sales calls." Keller, who did not work at the firm, making a claim that she has no proof of and again, this was a company with managers and over 100 employees. To say that Tucci was over training customer service agents is completely inaccurate and a question of material fact.

Keller also stated "Tucci's office was next door to FDATR's telemarketing operations until 2017 and he regularly spent time on the sales floor". Again, testimony by Keller who did not work at the firm. Defendant Tucci was the CEO of Direct Media Power, he did not work at FDATR. He asserts months would go by where he would not even step foot into the operation and reiterates that they were in completely separate offices in the same building but not connected. You would have to walk outside about 400 feet to a separate entrance to enter FDATR. To say that Tucci spent regular time is not true, when he actually spent very minimal amounts of time there.

Keller also went to allege that Tucci actively monitored FDATR's telemarketers through cameras he installed at Tel-Debt which later became FDATR with video feeds that he could view at his office desk". Again, here we have Keller who never worked at FDATR with accusations, but Defendant does contend that he installed security cameras at both direct media power and at FDATR and that the video feeds were indeed in his office. He asserts this was done as a security precaution but very rarely did Defendant ever look at the cameras.

Plaintiff's motion then goes on to say that Defendant used a "VoIP phone system that allowed Tucci to listen to a company's phone calls". Defendant asserts it is allowed, and that the entire company and all its managers listen to phone calls. This is called making sure your company is running correctly and allowing your managers to make sure employees are following protocol. It was not a system designed for just Defendant's use.

It is further alleged Defendant sent and received emails related to FDATR and had the ability to view all emails sent to or from an FDATR e-mail addresses. Again, this is completely taken out of context. This was a large company with over 100 employees. The emails would go to the server, a copy of every e-mail would go to the server, and yes Tucci could access them but it is very foolish to think that every e-mail was reviewed. It was again only used in situations if an incident ever came up with him with an employee's conduct being the concern.

"Tucci was blind CC'ed on every FDATR manager e-mail account and routinely reviewed the emails." Again, this is another comment brought on by tainted witness Desiree Keller. Defendant was not blind CC'ed on every e-mail and there is no actual proof again making it a question of material fact.

"Tucci monitored FDATR's chargebacks". A complaint a consumer makes with a bank to contest credit card charges via a website link and discuss those chargebacks with FDATR's managers is correct. Defendant wanted to make sure that managers and customer service agents were handling any type of client issues correctly. The company had a very strong policy on handling customers that could not get resolution per the direction of the Department of Education and would refund those customers if needed. the student loan doc prep company had a very strong 100% money back guarantee and the very few people that would just call directly to try and get a refund. To understand chargebacks, a credit card processor only allows 1.5% of total sales to have chargebacks. If you exceed that amount you lose your merchant account. The student loan doc prep company and the tax prep business had less than 1/2 of 1% of total clients that turned into chargebacks and every single client that turned into a chargeback was completely refunded. When you're dealing with government agencies not every person that the company was initiated to help was able to reach satisfaction. The company did not control the Department of Education nor the IRS.

"Until at least 2017 Tucci controlled FDA TR's bank accounts and was a signatory on those accounts". Defendant asserts that this is accurate.

The allegation that Defendant Tucci misappropriated company funds is explained as follows. Until at least 2017, Defendant controlled two FDATR bank accounts and was a signatory on those accounts. Tucci decided how FDATR spent its money, and he regularly moved money between bank accounts held by FDATR and Direct Media. He asserts when money was moved in between accounts it was for cash flow purposes, and it was diligently monitored on QuickBooks as a due-diligence failsafe. He reiterates that money was moved when Desiree Keller was trying to extort fees from him, actions that were propelled by the falsity stated by Desiree Keller that there was money taken out of Direct Media Power that went to Defendant Tucci for his own personal use.

Had Direct Media Power not been put out of business, their monies would have been repaid. Tucci asserts that every single dollar that went in and out of Direct Media Power and FDATR that paid on personal items was clarified and was covered by W2's.

He contends that this allegation is unfounded and there was no money that was ever taken out of either company that wasn't claimed or accounted for. Plaintiff also set forth Defendant Tucci routinely used company funds to pay his personal rent, his car payment, support payments and even paid for cosmetic surgery for his girlfriend. Tucci asserts that a company can spend its money any it wants, and further, how one expenses that money is up to the company. Expenses can be taken in lieu of wages, and Defendant asserts that any and all of this alleged "personal spending" was clearly and undeniably accounted for.

Plaintiff went on to allege that "Defendant Tucci transferred ownership of FDATR to former co-defendant Ken Halverson to protect the company's assets from a creditor". Tucci counters this claim and asserts that the company was sold in an agreement in which Mr. Halverson paid $138,000 for the company and took full ownership of the firm. Defendant Tucci states that it was not done to protect assets from a creditor, but it was done because Mr. Halverson was going to invest money into the firm and help it grow. FDATR was not part of any lawsuit, so to say that Tucci was protecting assets was absolutely not true

The buyout agreement lists the purchase price of FDATR as $138,000 and states that the

amount shall be deposited into the company's primary bank account. Defendant asserts that this is correct and that is what happened. According to Tucci, the $138,000 listed in the buyout agreement was not paid to him but rather was a loan obtained by Halverson to keep the company operating again. That is completely accurate, and it was paid by American Express with full documentation.

It is then alleged that "at or near the time of the transfer of 2017, Tucci moved to an office in the same suite as the FDATR". Defendant asserts that is not accurate. Defendant actually moved into FDATR when Direct Media Power was forced out of business in May of 2017. Defendant already had an office in the building when Halverson assumed control of FDATR in July of 2017.

Plaintiff then goes on to state that "After the transfer, Tucci worked as a purported consultant for FDATR and his role remained the same as it had before the transfer". Defendant asserts that is not accurate. The day-to-day role was changed because Halverson assumed control of the business was managing the business and was handling all of the bank accounts. Defendant asserts he was a sales and marketing consultant for the firm so to say the role was the same is not true. As a consultant, Defendant remained involved in the company's advertising, marketing, and sales training. Defendant states this is true, and every single aspect of this business was controlled and approved by legal counsel.

Tucci remained with FDATR as a consultant until April 2019 shortly before the company ceased operating.

Tucci knew that FDATR took up front fees from consumers and that records about customer payment information obtained from the provider of the customer relationship management tool used by FDATR show that FTR stopped taking money from consumers in May of 2019. Defendant asserts this is true.

**TUCCI KNEW FDATR TOOK UP FRONT FEES FROM CONSUMERS**

Defendant once again reiterates that the CFPB has no right or jurisdiction over a doc prep or tax prep and accounting firm.

FDATR sent electronic enrollment documents to prospective customers but before sending the documents FDATR charged the customer between $1.99 dollars purportedly to ensure that it had a valid payment method on file. This is accurate, however the CFPB again is taking the process out context. Paperwork was only sent out after a three-way phone call with the Department of Education and when the Department of Education said that they could help the person get their loans out of default, only then was the paperwork sent out. It was only if the Department of Education approved the caller to get their loans out of default.

**TUCCI WAS ON NOTICE OF THE ILLEGAL CONDUCT**

For services, FDATR separately charged customers a minimum of $499 as a one time payment within two or three weeks of enrollment or $600.00 paid in installments over a three to six-month period with customers typically making the first payment within days or weeks of enrollment. Defendant asserts this is correct stating that the amount of work that went in to help customers getting their loans out of default was extremely intensive. FDATR had to go get wage garnishments removed, IRS refunds returned and had to work with multiple collection agencies to get them to release the loans back to the Department of Education. This was not work that could be done by any one individual on their own but was a team effort.

Defendant Tucci testified that FDATR spent at least three to six months to get a file completed and it always requested and received payment from customers for standard fees at or near the time of enrollment before it achieved any results. Defendant states that this is inaccurate and that there was never a file taken on unless the Department of Education specifically stated that they could take the customers defaulted loans and consolidate them into a new loan with

the Department of Education, so to say "any results" is completely inaccurate. If the file was not able to be helped, it was never started and in the rare event where the file could not be completed, which was not in the control of FDATR, then the money was returned. A file was never started unless the Department of Education made a statement that results could be seen and that loans could be consolidated and that consumers could be helped.

The next section states Tucci knew that FDATR made misrepresentations to consumers. Defendant contends again he is not sure not sure why the CFPB can make such an erroneous statement.

The Plaintiff then goes on to state that "Tucci admitted that student loan consolidations do not necessarily result in lower loan payments. do not eliminate payments, and can result in higher monthly payments." Again, the CFPB has no clear understanding of what a doc prep company does with student loan consolidations. The Department of Education specifically tells a doc prep company what can be offered FDATR has no say in what the resolution is for those loans once they're consolidated. It is based on a transcript of how much the customer is actually making, where they sit financially, and how many assets they have. There would have to be an inconsistent statement and a citation to discover assets would also be submitted to the Department of Education to substantiate what the caller stated on the first call, but again FDATR had no say so in the payments that were dictated by the Department of Education.

"Tucci admitted that FDATR did not track whether its services result in lower monthly loan payments for consumers". Defendant states that this is accurate because the business of the company was to get loans out of default and again this was dictated by the Department of Education. FDATR had no say as to what the payments were.

"Although FDATR promised that it could eliminate student loan payments, Tucci is unaware of any customer for whom FDATR eliminated student loan payments." Defendant asserts that is completely inaccurate and there was never a promise to eliminate student loan payments. Further, he contends the CFPB is conveniently taking out of context the own verbiage

and direction from the Department of Education that says if you were a public service agent you could get your loans eliminated. FDATR had no say in this matter.

"Tucci does not know whether any customers had their student loan payments cut in half despite FDA TR's promises that it would do so". Defendant states that again, the CFPB is taking this out of context. If loan payments were cut in half, it's because that was dictated by the Department of Education. there was never an FDATR promise that loan payments would be cut in half.

"Tucci does not know whether FDATR services actually resulted in any customers getting access to their diplomas and transcripts as the company claimed." Tucci asserts this was a service that was provided by the company and the company's attorneys and customer service agents would submit the proper paperwork to the universities and colleges that the loans were out of default. Whether or not the actual colleges or universities sent the customer their diplomas or transcripts was not the business of FDATR, that would have been supplied by the college or university.

"Tucci admitted that FDATR performed no services that would improve customer's credit scores or remove I-9 negative credit status codes ratings from customers credit reports". Defendant asserts again the CFPB is clearly not understanding the business of FDATR as a doc prep company. In fact, in agreements it clearly stated that FDATR was not a credit repair company and customers signed off on that.

"Tucci admitted that FDATR did not track whether its service is achieved promised results FDATR did not check its customers credit scores before or after the company purportedly performed its services and it had no way of knowing how or to what extent loan consolidation would impact the customer's credit scores." Defendant states that once again the CFPB is trying to make up nonsense that FDATR which was a doc prep company was doing credit repair. Defendant asserts there's absolutely no proof presented by the Plaintiff that this took place, so there would be no reason to get into any type of credit repair with the customer. In fact, on every

doc prep contract it clearly stated that FDATR was not a credit repair company, so this is a clear cut question of material fact.

"On October 13, 2017, the state of Illinois sued Tucci and FDATR among others for their part in engaging in deception by misrepresenting their services that was claimed to result in student loan elimination or reduction, in student loan forgiveness, or improved credit scores." Defendant asserts that's not what the Illinois attorney general case was about.

Tucci was served with the state of Illinois complaint on October 13 2017 and FDATR was served on October 16, 2017. Defendant states that this is correct.

**"TUCCI AND FDATR HARMED THOUSANDS OF CONSUMERS"**

The next statement declares that Tucci and FDATR harmed thousands of consumers. Again, Defendant Tucci was not the company and again, where are these thousands? The CFPB has yet to produce one person that was harmed, let alone thousands. It's laughable to make that statement. If you are going to make an allegation then present a witness. The CFPB cannot because they have no witnesses.

"FDATR enrolled more than 6000 customers nationwide who collectively paid it more than $2,000,000". This is again a statement by Ridder in her declaration who had no clue to what she was looking at. She was looking at a CRM that combined both doc prep customers and tax prep and accounting customers and they all were not customers, there were unsold leads in there too. The number of actual student loan doc prep customers who paid a fee to get their loans consolidated was at most maybe 1000, and this is a clear question of material fact.

FDATR uses CRM tool to maintain information about its customers including name addresses case numbers and case operating dates as well as information about money paid and refunded from FDATR between September 19, 2014, and May 10, 2019. Defendant states this is true.

"Data exported from the CRM into an excel spreadsheet and analyzed by the Bureau

shows that during this time period, 6046 customers paying paid between $1 and $2275. FDATR's customers collectively paid it $2,195,989 and FDATR refunded $78,856 to 485 customers". Again, Ridder is looking at student loan consolidation, doc prep business, tax prep and accounting business. She is combining it all into one business it was not all for student loan consolidation doc prep. If you look at the refund amount, it shows that the refunds on the company were 3.5% which means 96.5% of the people that were clients at FDATR for student loan consolidation, doc prep, tax prep and accounting were satisfied with their results and the 3.5% that were refunded were people that either the Department of Education and or the IRS could not help and the company with its unconditional money back guarantee refunded those customers.

Again, CFPB needs to show we're the damaged customers are because there are none. The last statement that the outstanding monetary consumer harm is $2,117,11 is statistically not Possible when you have zero complaints with the CFPB and you have 96.5% of the customers satisfied with their results, but you're going to now say that 100% of those customers that hired FDATR for student loan doc prep that was done in cooperation with the Department of Education and tax prep and accounting that was done with the IRS should all be refunded? The questions of material fact are truly overwhelming.

**CONCLUSION**

As stated above, and as simply put as possible, Plaintiff DEAN TUCCI states that the prevalent questions of Material-Fact are clearly blatant, evident, and numerous throughout Plaintiff's Motion for Summary Judgment.

Defendant prays this Court takes into careful consideration his Opposition to Defendant's Motion for Summary Judgment and grants a ruling in favor of this memorandum in-supra.

Respectfully submitted,

Dean Tucci

DATED THIS 21ST DAY OF NOVEMBER, 2024

BY: /s/ James DiBella

James DiBella, one of his attorneys

James DiBella
DiBella and Associates, LLC
1 Magnolia Parkway
Hawthorn Woods, IL 60047
Phone: 847-744-0990
Email: jamesdibellaesq@gmail.com
ARDC: 6311559