IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Bureau of Consumer Financial Protection, | ) | Case No. 1:20-cv-06879 |
| *Plaintiff*, | ) | |
| | ) | Judge Georgia Alexakis |
| v. | ) | |
| FDATR, Inc., et al., | ) | |
| *Defendants*. | ) | |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF BUREAU OF CONSUMER AND FINANCIAL PROTECTION**

Defendant FDATR, Inc. et. al respectfully moves this Court, pursuant to Federal Rule of Civil Procedure 56, for Summary Judgment in its favor and against Plaintiff Bureaus of Consumer and Financial Protection ("Bureau"). In support of its Motion, the Bureau states the following:

1. On November 20, 2020, the Bureau filed a Complaint against Defendant Dean Tucci and his company FDATR, Inc. (FDATR) for (1) deceptive and abusive telemarketing acts or practices that violate the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6101–6108, and the Telemarketing Sales Rule (TSR), 16 C.F.R. §§ 310.3, 310.4, and (2) deceptive acts or practices that violate §§ 1031 and 1036 of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5531, 5536. The Bureau sought injunctive relief to enjoin the Defendants from further violating the TSR and CFPA, along with additional relief as the Court may deem just and proper, including the recission of contracts, monetary relief against Defendants, including the refund of monies paid and restitution; disgorgement of ill-gotten revenues against Defendants; civil money penalties against Defendants; and the costs of bringing this action.

2. Plaintiff further asserts that they were granted a valid default judgment against all enjoined defendants. Defendant Tucci disputes this claim.

3. Further, plaintiff claims Defendant Tucci is liable under both the TSR and the

CFPA for FDATR's violations, and that Defendant Tucci founded and controlled every aspect of FDATR, including its advertising, telemarketing, and finances. Tucci also disputes this claim and states there is no valid proof of said claim.

4. Summary Judgment is appropriate for Defendant in this matter because the undisputed facts show that Defendant Tucci was improperly enjoined, and erroneously made responsible for day-to-day activities within the organization that he had no control over.

5. For the reasons above, and those set forth in the Defendant's accompanying Memorandum in Support of Defendant's Motion for Summary Judgment Against Plaintiff, Facts Presented, and Affidavit of Dean Tucci, Defendant Tucci respectfully requests that this Court enter an order:

A. Granting summary judgment in favor of the Defendant and against Plaintiff,
B. Dismissing the underlying case with prejudice,
C. Awarding the costs of defending this action, as well as such other and additional relief as the Court may determine to be just and proper.

DATED THIS 22ND DAY OF JANUARY, 2025.

Respectfully submitted,

/s/ James DiBella
One of his attorneys.

James DiBella
DiBella and Associates, LLC
1 Magnolia Parkway
Hawthorn Woods, IL 60047
847-744-0990
jamesdibellaesq@gmail.com
ARDC: 6311559

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Bureau of Consumer Financial Protection,<br><br>*Plaintiff*,<br><br>v.<br><br>FDATR, Inc., et al.,<br><br>*Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 1:20-cv-06879<br><br>Judge Georgia Alexakis |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF BUREAU OF CONSUMER AND FINANCIAL PROTECTION**

**JURISDICTION AND VENUE**

This Court has subject matter jurisdiction over this action because it is brought under "Federal consumer financial law," presents a federal question, and is brought by an agency of the United States charged with regulating the offering and provision of consumer-financial products and services, including by enforcing the CFPA and TSR. Venue is proper in this district because Defendant Tucci is or was located, resides or resided in, and does or did business in this district.

**INTRODUCTION**

Plaintiff, the Bureau of Consumer Financial Protection, brings this matter against Dean Tucci ("Tucci"), Kenneth Halverson and FDATR, Inc. in five counts. The first three counts allege violations of the Telemarketing Sales Rule, 16 C.F.R §310.1 et. al. (the "TSR"), a fourth count under 15 U.S.C. §6102 alleging a violation of 12 U.S.C §§5531, 5536(a)(1)(A) based upon the alleged violation of the TSR, and a fifth count alleging violations of 12 U.S.C §5531(a) and 12 U.S.C §5536(a)(1)(B) of the Consumer Financial Protection Act (the "CFPA"). Tucci is the only remaining defendant. Kenneth Halverson passed away shortly after this matter was filed and FDATR Inc. is dissolved. Plaintiff has filed a Motion for Summary Judgment on all counts against Tucci. The plaintiff's motion was granted in part; however, the court requested further briefing from the parties as to remedies. In this Memorandum, Tucci will show that, in fact, Plaintiff has failed to present any credible evidence that Tucci is liable for the default judgment entered against

FDATR Inc. or has violated any rule or statute alleged in the complaint. Tucci has filed a Motion for Summary Judgment based upon the lack of evidence and requests Summary Judgment to be entered in his favor on all counts.

## FACTS PRESENTED

Dean Tucci incorporated FDATR on December 15, 2014. On the incorporation documents, Tucci was named as director. In the first annual report filed in 2015, he was listed as President, Secretary, Treasurer and Director. FDATR was an acronym for "Federal Debt and Tax Relief" - a full-service tax prep and accounting firm that also handled doc prep federal student loan consolidation. From 2014-2019, FDATR employed over 100 people including tax attorneys, CPAs, IRS Enrolled Agents and a customer service staff. FDATR provided document preparation, along with submission and tracking services for customers with tax (IRS) and student loan (Department of Education) issues. FDATR would help the customer to resolve these matters. FDATR's customers were generated from radio and television advertisements. From its inception to May 2017, advertisements and leads were generated by Direct Media Power. In July 2017, Kenneth Halverson bought FDATR. Despite sales of approximately $1.5 million, FDATR still had operating expense shortfalls. Tucci sold Halverson his entire interest in FDATR. Halverson invested $138,000.00 of capital into the operating account and took over the obligations of FDATR. An Amended Domestic Corporation Annual Report was filed in July 2017, naming Kenneth Wayne Halverson as President and Director. Upon assuming control of the company, Halverson moved all advertisements and lead generation to National Media Calls, Inc., a company which he owned and controlled. After the purchase of FDATR by Halverson, Tucci became a consultant to FDATR, providing sales and marketing services. In May 2019, Halverson terminated Tucci's consulting contract. FDATR was dissolved on September 29, 2020.

FDATR's business was primarily generated through television and radio advertisements. A customer would call a toll-free number and would ultimately be directed to a customer service agent. A three-way call would be made with the Department of Education and if a customer was determined to be eligible for relief by the Department of Education and the customer wanted to proceed, a contract was sent to the client for signature. Upon receipt of the signed contract, an FDATR case manager would again contact the appropriate agency with the client to authorize its representation and determine what services could be

provided. Thereafter, the client would make an initial payment to commence the file. Initial payments could be as low as $1.00. Fees for student loan services were $600.00. Payments could be made over the term of the services, but no mandates were made by FDATR as to the amounts to be paid incrementally. FDATR was flexible in its receipt of payment. If a customer wished to pay the full amount up front, the fee was discounted to $499.00. The contract provided for a full refund of all sums paid if FDATR could not successfully help the client. Additionally, the following language was prominently displayed on the first page of the contract:

> "Client expressly acknowledges and agrees that the Company does not provide student loan financing of any kind, does not represent itself as a Lender, and did not and does not represent itself to be affiliated in any way with any governmental agency, that Company is a document preparation, submission and tracking service, and that Company has not represented that it will advise or assist Client in the modification, improvement, or correction of credit entries on Client's credit reports."

Customers were informed from the onset of the relationship that FDATR was only a document preparation, submission and tracking service. Every client executed an authorization for FDATR to aid them through its services.

Dean Tucci testified in his deposition regarding his involvement with FDATR. Although he was the owner of FDATR until July 2017, he did not receive income from FDATR. He was employed and paid by Direct Media Power ("DMP"), his advertising company. He testified that he would visit the FDATR office between once a week and once a month, until DMP ceased operations in May 2017. Thereafter, he maintained an office in the office suite occupied by FDATR. Tucci testified that the final decisions on some, but not all employees, were made by him. The final decision to employ sales agents was not his department. He did make some decisions regarding firing people. He testified that he did not run the sales team. FDATR had a manager who handled the sales agents. In June 2016, Tucci hired Kenneth Halverson to oversee all operations of FDATR.

FDATR utilized a VOIP telephone system, which allowed employees to listen to ongoing calls or listen to recordings later. Tucci testified that he never listened to live calls. A video security system was set up in the office of DMP and in FDATR's offices. Tucci did not use the system to

oversee employees. He denied being personally "bcc'd" on every email. All emails he received were through DMP. He had no responsibility for the content of the FDATR website, other than his employee purchased and paid for the domain name in his name. He made decisions about how FDATR spent its funds prior to the buyout and had meetings with Halverson regarding expenditures after the buyout. Tucci testified that the only employees he worked with at FDATR were tax people. The company employed several attorneys, certified public accountants, enrolled agents and customer service representatives. According to Tucci, the student loan services portion of FDATR discontinued business in 2017. FDATR used customer service scripts. Tucci admitted to drafting customer service scripts. Plaintiff has offered one script as evidence in this matter and Tucci denied drafting the script presented. He testified that he drafted scripts for the tax services, but not for the student loan services. He worked with the managers of FDATR to handle any chargeback situation which arose.

Tucci relied on the advice of several attorneys including Robbie Birnbaum, President of the Student Loan Consolidation, Association, an attorney employed by FDATR, who had worked for many years in the industry. Birnbaum assured him that the representations being made on their website were taken directly from the information provided by the Department of Education. Tucci did not receive any money from FDATR and was not paid for his services prior to his consulting agreement with Halverson in July 2017.

Plaintiff's entire case regarding Tucci's involvement in FDATR relies on the testimony of Desiree Keller. At all times herein, Desiree Keller was an employee of Direct Media Power. She never worked for FDATR. Keller duties largely consisted of office management and payroll for DMP. She worked for DMP for seven years. Tucci helped set up Brian Czahor and Deisree Keller to operate another business named Broadcast Media Partners, Inc. (BMP) in May 2017. Shortly thereafter, in August 2017, Keller and Czahor stole all of the money in BMP's bank account and, in essence, shut down the business. Halverson reported the theft to the Oak Brook Terrace Police Department and initiated a lawsuit against both Czahor in DuPage County court. (See: 2018L 000234 - FDATR INC -VS- BRIAN CZAHOR, et. al.) Faced with potential criminal charges and a civil lawsuit for theft, Keller had the motivation to hurt FDATR and Tucci. She and Czahor reached out to the Illinois Attorney General at that time and made false claims against FDATR to try to hurt the business and Tucci. This basis is the origin of this suit.

Desiree Keller's testimony contradicts Tucci's testimony in most ways. However, Keller did confirm certain facts. Keller testified that FDATR was a student loan and tax help business.

She was not aware of FDATR being involved in telemarketing. She confirmed that Tucci met with the FDATR managers to discuss chargebacks. She confirmed that Tucci had access to the security cameras, but did not testify as to whether cameras were installed in the suite occupied by FDATR. She testified that sales staff were not expected to enroll a certain number of consumers, and she was not aware of any staff member being written up for failing to enroll enough consumers. She confirmed that DMP had web designers on staff because Tucci did not know how to write code.

She further testified that Tucci would congratulate a sales representative when they made a big sale, but she did not distinguish between the tax service business and the student loan business. She testified that although she testified as to whether certain personal expenses were recaptured on Tucci's taxes, she later testified that she had nothing to do with the preparation of the tax returns of FDATR. Although she testified that money moved between various entity accounts, she never personally moved any money and based her testimony upon a review of the QuickBooks online ledger. She testified that Dean Tucci would write scripts, but did not testify as to the language utilized in the scripts. On cross examination, Keller admitted that she never participated directly in a call with any student loan client while employed by any of Tucci's companies, she identified two staff attorneys working with FDATR, Barry Footlick and Frank Calabrese, she had no knowledge of any complaint or action against FDATR taken by the U.S. Department of Education.

Unfortunately, Keller testimony regarding her contact with Tucci was false. In her deposition, Keller testified that after leaving her employment with Tucci in May 2017, the only contact she had with Tucci was at her wedding on March 29, 2017, and in court while giving testimony on another matter. Contrary to her statements, on or about March 5, 2019, Tucci texted Keller regarding payroll financial irregularities during her time managing payroll at Direct Media Power. Keller oversaw payroll for Direct Media Power. A review of the time records revealed that Keller modified her time clock entries and, between the months of February 2016, and May 2017, Keller paid herself 534 hours of time for which she did not work. On said date, Tucci texted Keller and informed her of the discovery and demanded payment immediately or risk litigation and/or criminal prosecution. At the time of Keller's deposition, the matter was subject of the DuPage County complaint (see supra), and this matter remained unresolved.

The only evidence of any representations made to any customer which Plaintiff has provided is the printout of the website and the sales script. Plaintiff has not presented any customer testimony, salesperson testimony, manager testimony, or complainant testimony regarding the

content of any sales call, the services of FDATR, or the amounts which any student loan services client may have paid.

## STANDARD ON SUMMARY JUDGMENT

A party is entitled to summary judgment under Fed. R. Civ. P. 56 if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986).

The evidence at summary judgment is taken in the light most favorable to the opposing party, and the opposing party receiving all reasonable inferences in their favor at the summary judgment stage. Clicks *Billiards Inc. v. Sixshooters Inc.,* 251 F.3d 1252, 1257 (9th Cir. 2001). Although determinations of credibility and drawings of inferences from evidence are normally jury functions, a "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient ......" *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 255, 106 S.Ct. 2505 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587, 106 S.Ct. 1348 (1986) (quotations and citation omitted).

## ARGUMENT

In support of Tucci's request for a granting of Summary Judgment in his favor, Tucci contends that Plaintiff has failed to present any evidence which would result in a question of fact as to his liability under any count of the Complaint. Further, what evidence they have provided supports the argument that no violations of any Rule or Statute occurred.

## SUMMARY JUDGMENT - COUNTS I TO IV

The first four counts of Plaintiff's complaint require a violation of the TSR. The TSR defines certain actors who must be conducting business in a certain fashion for liability to exist. In §310.2 of the TSR, the rule defines Telemarketing as "(hh) a plan, program, or campaign

which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call." The same section defines Telemarketer as "(gg) . . . any person who, in connection with telemarketing initiates or receives telephone calls to or from a customer or donor."

To prove Count 1, Plaintiff must prove that Tucci violated Rule §310.4(a)(5)(i). To maintain a claim based upon this Rule, the Plaintiff must evidence that, in the process of providing debt relief services, if the telemarketer or seller requests or receives "payment of any fee or consideration for any debt relief service" unless the "seller or telemarketer" has completed the negotiation on behalf of the customer and the customer has executed a settlement agreement, the customer has made at least one payment pursuant to the settlement agreement, and the fee bears a proportionate relationship to the debt amount or is percentage of the amount saved by the Customer.

To prove Count 2, Plaintiff must prove that Tucci violated Rule §310.4(a)(2). To maintain a claim based upon this Rule, the Plaintiff must evidence that, in the process of providing debt relief services, it is considered abusive telemarketing act or practice if any "seller or telemarketer" to request or receive "payment of any fee or consideration for goods or services represented to remove derogatory information from, or improve, a person's credit history, credit record, or credit rating" before the timeframe for performance has expired and the seller or telemarketer as completed the service and provided the customer with documentation evidencing the credit repair.

To prove Count 3, Plaintiff must prove that Tucci violated Rule §310.3(a)(2)(iii) and (x). To maintain a claim based upon this Rule, the Plaintiff must provide evidence that a "seller or telemarketer" misrepresented, directly or by implication, in the sale of goods or services "any material aspect of the performance, efficacy, nature or central characteristics of goods or services that are subject of a sales offer" or "any material aspect of any debt relief service."

Finally, to prove Count 4, based upon the allegations in Plaintiff's complaint, Plaintiff must first prove that a violation of the TSR occurred.

## I. PLAINTIFF FAILS TO ESTABLISH THAT ANY IMPROPER REPRESENTATIONS WERE MADE BY TELEPHONE IN VIOLATION OF THE TSR.

Plaintiff has failed to provide any evidence that telemarketing was taking place at FDATR. Turning to the evidence which Plaintiff has presented, Plaintiff has provided a website printout, a

Facebook posting and one script which appears to deal with the student loan service. The website printout and Facebook posting are irrelevant to this inquiry as they do not involve telemarketing. Therefore, Plaintiff has been left with one script. The Plaintiff's only witness, Keller, testified that she never had anything to do with the student loan service and never spoke with a potential customer or client. Tucci testified that he did not write the script and did not know where it originated. His testimony is uncontested. Although having several years to do so, Plaintiff has not deposed any salespeople or managers of FDATR. Despite having conducted a pre-suit investigation and determining that 20 consumer complaints had been filed across the country, no customers were identified, interviewed or disposed. Perhaps it was not thought of as important considering the pre-suit investigation revealed that FDATR had serviced 6,046 customers and had refunded 485 of them per their contract. Regardless, Plaintiff has provided no credible evidence that any representation was made by telephone, despite ample opportunity to find a witness to testify. Every case reviewed which alleges a violation of these sections of the TSR involved testimony of someone who was a victim or a salesperson or manager from the offending company. Plaintiff has provided neither. Plaintiff cannot maintain a TSR claim without evidence of actual telemarketing calls. Therefore, Tucci Motion for Summary Judgment should be granted as to counts I through 4.

## II. PLAINTIFF FAILS TO ESTABLISH THAT THE SERVICES PROVIDED TO STUDENT LOAN CUSTOMERS WERE RELATED TO DEBT SERVICES OR CREDIT REPAIR.

Counts 1 through 4 require that Plaintiff provide evidence that the services provided by FDATR were related to debt services or credit repair. Plaintiff again fails to meet their burden to survive an adverse ruling in favor of Tucci for Summary Judgment. Plaintiff provides no evidence of the services which were rendered to the customer. Its primary witness, Keller, did not take part in the operation of DMP or FDATR, and therefore has no knowledge of the work which was done with clients. Again, Plaintiff had ample opportunity to find dissatisfied customers to testify, but they have not done so despite claiming to have actual knowledge of individuals who allegedly complained about the service provided by FDATR. Plaintiff could have deposed former salespeople or managers to provide witness testimony, but they have failed to do so. All customers signed a contract prior to the commencement of services which unequivocally stated that FDATR did not

provide credit repair services or debt services. Echoing Tucci's testimony, the contract states that FDATR is a "document preparation, submission and tracking service" only. Plaintiff provides no credible, material evidence to contradict these facts.

### A. THE TSR DOES NOT APPLY TO FDATR'S DOCUMENT PREPARATION SERVICES

The applicability of the advance fee ban provision in the "Federal Telemarketing Sales Rule", 16 C.F.R. Part 310 ("TSR"), to the business model that was operated by FDATR is one of the first misappropriation the Plaintiff set forth in their instant complaint and then their corresponding motion for summary judgment. As stated before, and reiterated here, the TSR applies to "Debt Relief Services", which are legally defined as "any service or program represented, directly or by implication, to renegotiate, settle or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors or debt collectors, including, but not limited to, a reduction in balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector."

As stated in-supra and the defendant's corresponding opposition to the plaintiff's motion for summary judgment, FDATR's goal was to provide document preparation service, information and assistance to its clients to help them navigate the different options they had to consolidate their outstanding loans. In doing so, FDATR did not represent to consumers that they would negotiate, settle or in any way alter consumers debts in any way.

Further, the FDATR "Client Agreement" stated that the "Company provides document preparation services to assist consumers who are applying for federal loan programs using Department of Education ("DOE") forms." Defendant goes on to assert that FDATR was a private company and was not affiliated with any government agency. As stated, for a fee, FDATR would assist in assembly and completion of student loan consolidation that was already offered on the Department of Education website. Defendant further asserts that the company never offered to engage in any negotiation or settlement process on behalf of its clients, and the company client agreement, approved by legal counsel, clearly states that it

does “not provide any form of…unsecured or secured debt relief.” FDATR also made it blatantly clear that the documents it prepared had to be submitted to the Department of Education for review and approval before any of the clients could receive relief under the Federal government program.

### B. THE TSR DOES NOT APPLY TO SERVICES RELATED TO REFINANCING OR CONSOLIDATING EXISTING FEDERAL STUDENT LOANS

In spite of the fact that FDATR was not a “debt relief service” as defined by the TSR, the FTC’s Final Rule Amendments issued in August of 2010 make clear that “the definition is not intended…to cover services or products that offer to refinance existing loans with a new loan as a way of eliminating the original debts, as such a process would result in a new extension of credit that replaces the existing debts rather than altering them.” Final Rule Amendments, Telemarketing Sales Rule, 75 Fed. Reg. 48458, 48466, fn. 123 (Aug. 10, 2010) (amending 16 CFR Part 310) (Emphasis Added.)

The Final Rule Amendments make clear that the TSR does not apply to loan consolidations, including those offered by the DOE’s student loan repayment programs, where existing student loans are consolidated by a “new extension of credit that replaces the existing debt”. For the reasons set forth in-supra, Defendant Tucci believes that he has violated the TSR in any way, shape or form. As no question of material fact exists, Summary Judgment should be granted to Tucci on all four counts.

## SUMMARY JUDGMENT - COUNTS V

Plaintiff’s last count of the complaint alleges a violation of the CFPA. Plaintiff alleges that FDATR and Tucci violated 12 U.S.C. §5536(a)(1)(B), wherein the statute states that “It shall be unlawful for (1) any covered person or service provider—

(B) to engage in any unfair, deceptive, or abusive act or practice. The further argue that 12 U.S.C. §5531(a) authorizes the CFPB to action. Again, Plaintiff’s argument fails.

### I. PLAINTIFF FAILS TO ESTABLISH THAT ANY UNFAIR, DECEPTIVE OR ABUSIVE PRACTICE OCCURRED.

In a similar manner to Counts 1 through 4, Plaintiff fails to provide any evidence that any

actual violation of the statute occurred. For an unfair, deceptive, or abusive act or practice to have occurred, Plaintiff should be required to produce someone who may have been harmed by FDATR or Tucci's actions and who could provide credible evidence that one of these actions may have taken place. As stated above, though, no such evidence exists, despite the opportunity for Plaintiff to procure such witnesses.

Additionally, Plaintiff fails to establish why it should be prohibited from pursuing this matter pursuant to 12 U.S.C. §5531(c) and (d). Subsection (c) sets forth the requirements to establish "Unfairness". The subsection states that:

"(c) UNFAIRNESS

(1) In General: The shall have no authority under this section to declare an act or practice in connection with a transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service, to be unlawful on the grounds that such act or practice is unfair, unless the Bureau has a reasonable basis to conclude that—

(A) the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers; and

(B) such substantial injury is not outweighed by countervailing benefits to consumers or to competition." 12 U.S.C. §5531(c)

Subsection (D), entitled "Abuse" states that:

"(d) ABUSIVE The Bureau shall have no authority under this section to declare an act or practice abusive in connection with the provision of a consumer financial product or service, unless the act or practice—

(1) materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service; or

(2) takes unreasonable advantage of—

(A) a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service;

(B) the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service; or

(C) the reasonable reliance by the consumer on a covered person to act in the interests of the consumer. 12 U.S.C. §5531(d).

Plaintiff fails to address either of these requirements. In fact, a review of Plaintiff's complaint is

devoid of any factual allegations which address this standard. It is clear to see, though, that the proof required to overcome the prohibition of CFPA authority to pursue these matters requires actual victims who can testify to the effects FDATR's services had upon them. Anything else is pure speculation. The Plaintiff has failed to meet any evidentiary level which overcomes this prohibition.

The Plaintiff has shown no evidence of fraud by the defendants. In this litigation, the CFPB is making claims that by taking an advance fee, the defendants performed no work. Simply put, the Plaintiff is accusing the defendants of stealing. If this were true, FDATR would have hundreds of complaints from the consumers they allegedly fraudulently converted. Since this litigation was initiated, there have been zero complaints recorded against the defendants for the aforementioned alleged actions.

In addition, almost every student made a small monthly payment for services while their file was being worked on, and their loans were consolidated. This is a ludicrous and insane assumption, by the CFPB, to make the outlandish claim that FDATR was committing fraud and not providing any services when it took a small, advanced fee for services. This ridiculous allegation has severely damaged Tucci.

The only evidence which Plaintiff does provide the court outside of Keller's and Tucci's testimony, is the Ridder declaration. Tucci contends that the results of the investigation evidence a company operating in good faith as opposed to the villainous company which Plaintiff alleges harmed thousands of people. Ms. Ridder determined that FDATR had approximately 6,046 consumers. Of those consumers, FDATR refunded approximately 485 consumers. Finally, Ms. Ridder, after reviewing the Sentinel system, which allows members to access consumer complaints submitted directly to the FTC, as well as complaints shared by over 40 data contributors, including the Bureau, over 30 State Attorney General offices, and all North American Better Business Bureaus, found 20 complaints to review. 0.33% of FDATR's customers filed complaints. Instead of thousands of people being harmed, it appears that FDATR and Tucci helped thousands of people and the US Department of Education cure hundreds of millions of dollars in defaulted loans. Yet, somehow the CFPB calculates over $40 million in fines against a company that had total revenues of $2.1 million. Based upon the total lack of any evidence indicating a violation by FDATR or Tucci of §5536(a)(1)(B), Tucci's Motion for Summary Judgment should be granted as to Count V.

## CONCLUSION

In summary, Plaintiff makes claim that this was a "telemarketing" firm with no actual evidence of such. Plaintiff also alleged that this tax prep and accounting firm should have been governed by the TSR debt settlement law that went in effect in 2010 for companies that did "credit card debt settlement" although they have not shown any evidence that FDATR engaged in this type of business. Plaintiff made this allegation because FDATR took advance fees – as do all tax prep and accounting firm do -- and then claimed, "If you take advance fees you are committing fraud." Plaintiff then made the claim that for the advance fees no work was provided by FDATR to their clients, however, Plaintiff has shown no evidence of such. In fact, in the 6 years since this case started, Plaintiff has not produced even one customer that was allegedly defrauded, nor have they provided even one customer complaint. Plaintiff has also completely ignored that FDATR worked hand in hand and was authorized by another government agency, the US Department of Education, to get their federal student loan clients out of default. Plaintiff has also alleged that FDATR was acting as a credit repair agency, however, they have shown no evidence of such other than one line on the FDATR website that stated, "Improve Your Credit Score" (when your loans get out of default). Plaintiff also failed to recognize that FDATR helped hundreds of students struggling with student loan payments who were finally able to get those student loans out of default with the help of FDATR and that by doing so the Federal Government was able to recoup over $100 million dollars in defaulted student loans. Ironically, the same Federal Government that pays for the CFPB to be in existence. Plaintiff has also shown no evidence that Tucci was "the company and the company was Tucci" and that they should be allowed to pierce the corporate veil and hold Tucci personally liable for any of the fines or fees associated with the default judgement against FDATR – which occurred because the owner of FDATR, Ken Halverson, passed away right after the complaint was filed. Plaintiff also completely ignored the fact that their only "witness" in 6 years, Desiree Keller, stated she was not an employee of FDATR and ignored the fact that she was involved in civil and criminal legal matters against both Halverson and Tucci while this suit commenced. Because they had no ability to collect against Halverson, thus making Tucci "the last man standing," Plaintiff then put together a Motion for Summary Judgement against Tucci personally with a ridiculous fine against Tucci making the ridiculous allegation that *every* client of FDATR was defrauded and

therefore, CFPB was entitled to $40 million in fines. Plaintiff then made sure that the case was publicized online in an attempt to get Tucci to settle. These witch-hunt extortive actions have severely damaged Tucci over the years and will continue to do so..

**PRAYER FOR RELIEF**

Based upon the foregoing arguments, it is clear that the CFPB's reckless pursuit against Tucci over the last 6 years has damaged him personally and financially and will continue to do so for his entire lifetime (the internet lives forever). Tucci requests the Court enter Summary Judgment in favor of Tucci and against Plaintiff on all counts of the Complaint. Tucci requests this case be dismissed with prejudice. In addition, the CFPB has admitted they only took on this case at all because the "IL AG case was stagnant" again ignoring why it was stagnant. Additionally, due to the lack of any credible evidence of damaged consumers presented by Plaintiff, Tucci requests this court award him his reasonable attorney's fees of over $100,000 and other compensatory damages, as well as, an award of punitive damages in an amount to be determined by the court to be paid by Plaintiff.

DATED THIS 22nd DAY OF JANUARY, 2025

Respectfully submitted,

By: /s/ James DiBella

One of his Attorneys

James DiBella
DiBella and Associates, LLC
1 Magnolia Parkway
Hawthorn Woods, IL 60047
847-744-0990
jamesdibellaesq@gmail.com
ARDC: 6311559